UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------
RACHEL BABBITT,

                        Plaintiff,

            -against-

KOEPPEL NISSAN, INC., MARK C. LACHER,
Individually, and NELSON ONOFRE,
Individually,

                        Defendants.
-------------------------------------------------------

**MEMORANDUM & ORDER**
18-CV-5242 (NGG) (CLP)

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff/Counter-Defendant Rachel Babbitt brings this action against Defendants/Counter-Plaintiffs Koeppel Nissan, Inc. ("Koeppel"), Mark C. Lacher, and Nelson Onofre (collectively "Defendants"), alleging employment discrimination, a hostile work environment, and retaliation. Before the court is Babbitt's motion to dismiss Defendants' counterclaims. (*See* Mot. to Dismiss (Dkt. 47).) For the reasons set forth below, Babbitt's motion is GRANTED.

## I. BACKGROUND

### A. Babbitt's Complaint

Babbitt began working for Koeppel as a finance manager in or around August 2017. (*See* Second Amended Complaint ("SAC") (Dkt. 23) ¶ 15.) At all relevant times, Defendant Lacher was Babbitt's supervisor and the Chief Executive Officer of Koeppel. (*Id.* ¶¶ 10-11.) Babbitt alleges that Koeppel had a "zero-tolerance policy" for discrimination in the workplace. (*Id.* ¶ 32.) She likewise alleges that her performance was "above average and satisfactory while working for" Koeppel. (*Id.* ¶ 45.)

In or around September 2017, Babbitt met Defendant Onofre, another Koeppel employee. (*Id.* ¶¶ 12, 16.) Onofre claimed to be

1

Lacher's "right-hand man" and told Babbitt that he was an "important person to have on your side." (*Id.* ¶ 16.) Babbitt alleges that on the day she and Onofre met, Onofre commented to her "wow, I've never had a red-headed white girl like you before." (*Id.* ¶ 17.) Onofre continued to be sexually inappropriate towards Babbitt and repeatedly made unwanted sexual advances toward her. (*Id.* ¶ 18.) For example, Babbitt alleges that Onofre:

- Stared at Babbitt "up and down," "checking out" her body;
- Told Babbitt "there is something about you" and that he knew being with her sexually "would be amazing";
- Entered Babbitt's office, "grabbed and kissed her hand, and then placed her hand on his forehead";
- Forced Babbitt to stand and spun her around so he could "look at her body";
- Slid Babbitt's chair back "if Plaintiff wore a skirt or dress" so he could "leer" at her legs;
- Made moaning sounds when walking behind Babbitt;
- Told Babbitt "your ass is amazing";
- Entered Babbitt's office singing "you are so beautiful, to me";
- Said "let me stop myself, the things I would do to you," while moaning and grunting, and then bit his finger.

(*Id.*)

Babbitt alleges that she did not immediately complain about Onofre's behavior because he was close friends with Lacher and Melissa Drapala, Koeppel's Human Resources Manager. (*Id.* ¶ 19.) She believed that had she complained about the harassment, Defendants would "retaliate against her and even terminate her employment." (*Id.*) However, Onofre's harassment of Babbitt

2

only grew worse. For example, Babbitt alleges that Onofre told her that he wanted to take her out for drinks and then get a hotel room, continuing: "we would have sex everywhere. Start in the bar having drinks, then go in the bathroom and have sex there, have sex in the car, get a room and have sex in the room, on the balcony, then go to another room and have sex all night." (*Id.* ¶ 21.) In or around February 2018, Babbitt alleges that Onofre told her that "women in their thirties are the best. Your pussy is in her prime right now." (*Id.* ¶ 23.) Babbitt alleges that she objected to Onofre's advances, telling him several times statements to the effect of "you can't say things like that." (*Id.* ¶ 24.) Onofre, however, would respond with comments like "it's between you and me," "you know I like you," and "I know your kind. You can hang." (*Id.*)

Babbitt alleges that in March 2018 one of her former coworkers informed Lacher that Onofre was sexually harassing Babbitt. (*Id.* ¶ 25.) Lacher fired Babbitt two hours later, citing "paperwork," "customer handling," and "compliance" as his reasons (but providing no documentation). (*Id.* ¶ 27-28.) Babbitt asked Lacher to elaborate on the rationale for her firing, and observed that the timing of her termination was "interesting" given that Lacher had learned about Onofre's sexual harassment of Babbitt earlier that day. (*Id.* ¶ 30.) However, Lacher did not provide any more details to Babbitt, but stated again that there were paperwork issues and "a lot of other stuff too which we're looking at now." (*Id.*) Babbitt further alleges that when Lacher learned that Babbitt intended to sue Defendants he informed Babbitt's subsequent employers about Babbitt's accusations. (*Id.* ¶ 40.) Specifically, Babbitt alleges that Lacher informed Joe Gianelli, Babbitt's manager at one of her subsequent employers, that Babbitt was "a trouble maker" and was creating "legal issues" for Defendants. (*Id.* ¶ 41.)

3

### B. Defendants' Counterclaims

In their counterclaims, Defendants allege that Babbitt's job as a finance manager "was to produce revenue for Koeppel by selling finance and insurance programs as well as other appropriate after-sale items to new and used vehicle customers." (Answer & Counterclaims (Dkt. 32) ¶ 115.) In this position, Babbitt was required "to process credit applications on behalf of Koeppel's customers." (*Id.* ¶ 117.) This process involved customers completing the credit application by hand before it was "typed up" by Babbitt or another finance manager. (*Id.* ¶ 118.) Defendants allege that "[o]n many occasions, [Babbitt] intentionally falsified the credit applications by (1) significantly inflating the applicant's alleged salary, including entering an income $20,000-$30,000 more than the customer's actual income; and (2) forging the signatures of customers." (*Id.* ¶ 119.) In falsifying this information, Defendants allege, Babbitt "(1) caused herself to earn income that she would not otherwise have earned; and (2) intentionally defrauded the lending institutions for her own personal gain and caused Koeppel to risk significant legal exposure." (*Id.* ¶ 120.) Defendants also allege that, on at least one occasion, Babbitt "intentionally stole a portion of a customer's down payment." (*Id.* ¶ 121-122.) Defendants allege that as a result of Babbitt's actions they had to issue that customer a reimbursement check for $2,000. (*Id.* ¶ 123.)

### C. Procedural History

Babbitt filed her complaint in this court on September 18, 2018. (Compl. (Dkt. 1).) Defendants requested a pre-motion conference regarding an anticipated motion to dismiss, but withdrew that request when Babbitt stated that she was not asserting any retaliation claims. (*See* Defs. Nov. 26, 2018 Letter (Dkt. 13).) Defendants answered the complaint on December 10, 2018. (Answer (Dkt. 16)). Babbitt filed an amended complaint on

March 19, 2019. (Am. Comp. (Dkt. 18).) On April 2, 2019, Defendants requested a pre-motion conference in anticipation of moving to dismiss Babbitt's retaliation claims. (Defs. Apr. 2, 2019 PMC Appl. (Dkt. 19).) The court granted that request, and, at the subsequent conference, granted leave for Babbitt to amend her complaint and for Defendants to move to dismiss. (May 9, 2019 Min. Entry.)

Babbitt filed her second amended complaint on May 9, 2019. (SAC.) Babbitt brings six causes of action against Defendants: (1) against Koeppel for discrimination on the basis of sex in violation of Title VII (*id.* ¶¶ 50-53); (2) against Koeppel and Lacher for unlawfully retaliating against her in violation of Title VII (*id.* ¶¶ 54-62); (3) against all Defendants for discriminating against her on the basis of sex in violation of the New York City Administrative Code § 8-107(1) (*id.* ¶¶ 63-66); (4) against all Defendants for retaliating against her in violation of the New York City Administrative Code § 8-107(7) (*id.* ¶¶ 67-76); (5) against all Defendants for discriminating against her on the basis of sex in violation of the New York City Administrative Code § 8-107(6) (*id.* ¶¶ 78-81); and (6) against Koeppel as a liable employer under the New York City Administrative Code § 8-107(13) (*id.* ¶¶ 82-85). Plaintiff seeks damages for lost wages and benefits, as well as compensatory damages for mental, emotional injury, distress, pain, suffering, and injury to her reputation. (*Id.* ¶ 86.) She also requests punitive damages, attorneys' fees, and costs. (*Id.*)

On May 23, 2019, Defendants filed a letter requesting to file an answer with counterclaims before filing a motion to dismiss. (Defs. May 23, 2019 Letter (Dkt. 25).) The court denied Defendants' request, and Defendants filed their answer and counterclaims on May 30, 2019. (Answer & Counterclaims.) Defendants assert that Babbitt breached her fiduciary duty (*id.* ¶¶ 125-29) and duty of loyalty (*id.* ¶ 130-34), and also bring claims under the faithless servant doctrine (*id.* ¶ 135-42), for tortious

interference with business relations (*id.* ¶¶ 143-45), and for unjust enrichment (*id.* ¶¶ 146-50.) Shortly thereafter, Defendants also filed a request for a pre-motion conference in anticipation of moving to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs. June 4, 2019 PMC Appl. (Dkt. 37).) The court denied Defendants' request, explaining that "Defendants may not move for dismissal pursuant to [Rule] 12(b)(6) because they have already answered the Second Amended Complaint." (June 5, 2019 Order.)

On September 18, 2019, Babbitt filed a fully briefed motion to dismiss Defendants' counterclaims pursuant to Rule 12(b)(6). (*See* Mot; Mem. in Supp. of Mot. to Dismiss ("Mem.") (Dkt. 47-1); Mem. in Opp. to Mot. to Dismiss ("Opp.") (Dkt. 48); Reply (Dkt. 49).)

## II. LEGAL STANDARD

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a claim for relief. *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007).[1] In reviewing a pleading, the court must accept as true all allegations of fact, and draw all reasonable inferences in favor of the non-moving party. *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A pleading will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "is not akin to a 'probability requirement,'" but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when" the pleading includes "factual content that allows the court to draw the

---

[1] When quoting cases, unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

reasonable inference that the [non-moving party] is liable for the misconduct alleged." *Id.* "[M]ere labels and conclusions or formulaic recitation[s] of the elements of a cause of action will not do; rather, the [pleading's] [f]actual allegations must be enough to raise a right to relief above the speculative level." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

In contrast to the more generous standard applicable to most pleadings, pleadings that include allegations of fraud must be "pled with particularity" under Rule 9(b) of the Federal Rules of Civil Procedure. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). While the court must continue to accept as true all factual allegations in the pleading and draw inferences in favor of the pleader, the pleader must include more detailed information in order to give rise to an inference of fraudulent intent. *Id.* Specifically,"[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Mills*, 12 F.3d at 1175 (pleadings subject to Rule 9(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.").

The particularity requirement applies to "all averments of fraud . . . and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *see also Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 319 (S.D.N.Y. 2009) ("Rule 9(b) extends to all averments of fraud, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary."). Determining whether a non-fraud claim sounds in fraud such that it falls within the ambit of Rule 9(b) requires a case-by-case analysis of the particular pleadings. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007). The focus of a court's inquiry

7

is the conduct alleged. *Rombach*, 355 F.3d at 171. "A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004); *see also Marchak v. JPMorgan Chase & Co.*, 84 F. Supp. 3d 197, 211 (E.D.N.Y. 2015). "Courts have found non-fraud claims to sound in fraud where the underlying conduct alleged has been fraud or closely linked with fraudulent behavior, such as claims for which fraud is a necessary element or claims that the other party has attempted to induce action through misrepresentations or material omissions." *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 443 (S.D.N.Y. 2015).

## III. DISCUSSION[2]

### A. Applicable Pleading Standard

Defendants assert five counterclaims against Babbitt—breach of fiduciary duty and the duty of loyalty, violation of the faithless servant doctrine, tortious interference with business relations, and unjust enrichment. (Answer & Counterclaims ¶¶ 125-150.) However, each cause of action is premised on the same core factual allegations. Specifically, Defendants allege that Babbitt "intentionally falsified . . . credit applications by (1) significantly inflating the applicant's alleged salary, including entering an income $20,000-$30,000 more than the customer's actual income; and (2) forging the signatures of customers." (*Id.* ¶ 120.) Defendants also allege, upon information and belief, that Babbitt "intentionally stole a portion of a customer's down payment on at least one occasion." (*Id.*) Defendants describe the alleged scheme as follows:

---

[2] Babbitt argues that Defendants' counterclaims must be dismissed pursuant to Federal Rule of Civil Procedure 13. However, because the court grants Babbitt's motion on other grounds, it need not address this issue.

8

> On or about February 5, 2018, Babbitt finalized a deal for a customer who made a down payment of twelve thousand dollars ($12,000) in order to lower his monthly payments on his car to his desired monthly rate. Approximately one (1) month later, the customer noticed that his monthly rate was substantially higher than he had discussed with Babbitt when he leased his car. The customer then returned to Koeppel to inquire why his rate was higher than he anticipated. [Koeppel]³ then reviewed the customer's file which only reflected a down payment of ten thousand dollars ($10,000) when he had actually paid twelve thousand dollars ($12,000). As a result of Babbitt's improper and illegal conduct, Koeppel issued the customer a check for two thousand dollars ($2,000).

(*Id.* ¶¶ 122-23.)

The court finds that fraud is "an integral part of the conduct giving rise" to Defendants' claims, *Xpedior Creditor Trust*, 341 F. Supp. 2d at 269, and Defendants' allegations are therefore subject to Rule 9(b)'s heightened pleading standard. *See Levy*, 103 F. Supp. at 443; *see also Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11-cv-4362 (PKC), 2012 WL 1890388, at *8 (S.D.N.Y. 2012) ("When a breach of fiduciary duty claim is premised upon fraudulent misconduct, Rule 9(b) applies."). Here, Defendants allege that Babbitt allegedly falsified credit applications, forged signatures, and misdirected customer money with the intent of deceiving Koeppel (and others) for her own gain; this is paradigmatic fraudulent conduct. *See Rahl v. Bande*, 328

---

³ The counterclaim uses the word "Plaintiff" here. (Answer & Counterclaims. ¶ 122.) However, the counterclaims refer to the parties by name throughout. Therefore, the court assumes that this was a typographical error, and that Defendants intended to assert that it was Koeppel (and not Babbitt) who reviewed the relevant customer's file in response to the customer's complaint.

9

B.R. 387, 413 (Bankr. S.D.N.Y. 2005) (allegation sounded in fraud where defendants allegedly issue false financial statements in an attempt to "induce action or inaction . . . by means of falsehoods or material omissions.").

Defendants' arguments to the contrary are unavailing. Defendants argue that it "has not pled a cause of action for fraud," and that, of the causes of action it did allege, "none . . . require an allegation of fraud, and a showing of fraud is not necessary to prevail on any of these claims." (Opp. at 12.) Defendants further warn the court that if Rule 9(b) is applied in this case, "Rule 9(b)'s pleading standard would be applicable to nearly every cause of action." (Opp. at 14.) Yet, this argument fundamentally misconstrues the inquiry courts conduct in determining whether Rule 9(b) applies. Rule 9(b)'s applicability does not rest on whether a party has pled a cause of action for fraud or whether a particular cause of action requires an allegation of fraud. Instead, Rule 9(b) applies to "all averments of fraud ... and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach*, 355 F.3d at 171. In evaluating Rule 9(b)'s applicability, "*Rombach*. . . requires a case-by-case analysis of the particular pleadings," to avoid the very slippery-slope concern raised by Defendants. *In re Refco*, 503 F. Supp. 2d at 632.

Here, an analysis of Defendants' allegations make clear that "the gravamen of the [counterclaims] is plainly fraud." *Rombach*, 355 F.3d at 172. Accordingly, the court applies Rule 9(b)'s heightened pleading standard to each of Defendants' claims.

### B. Counterclaims I & II—Breach of Fiduciary Duty and Duty of Loyalty

Defendants first assert counterclaims against Babbitt for breach of fiduciary duty and breach of the duty of loyalty. (Answer & Counterclaims ¶¶ 125-134.) As a preliminary matter, the duty of

10

loyalty encompasses one subset of the many duties that a fiduciary owes to his agent. *See* Restatement (2d) of Agency §§ 387-98. Defendants' claim that Babbitt breached a duty of loyalty (Count II) is thus duplicative of its claim that she breached a fiduciary duty, and is accordingly dismissed. *See Nicholsen v. Feeding Tree Style, Inc.*, No. 12-cv-6236 (JPO), 2014 WL 476355, at *4 (S.D.N.Y. Feb. 6, 2014).

"To state a breach of fiduciary duty claim under New York law, a plaintiff must plead: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018). "A fiduciary relationship exists under New York law when one person is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation." *Id*. Under New York law, "it is well settled that an employee owes a duty of good faith and loyalty to an employer in the performance of the employee's duties." *Slue v. New York Univ. Med. Ctr.*, 409 F. Supp. 2d 349, 373 (S.D.N.Y. 2006).

Here, applying Rule 9(b)'s heightened pleading standard, Defendants' allegations fail to demonstrate Babbitt knowingly breached a fiduciary owed to Defendants. Defendants' claim relies on allegations that Babbitt "intentionally falsif[ied] credit applications, forg[ed] customer's signatures, and st[ole] from customer's down payments." (Answer & Counterclaims ¶ 128.) However, these allegations lack the necessary particularity to meet Rule 9(b)'s requirements. For example, Defendants allege that Babbitt intentionally falsified credit applications "on many occasions" and "forg[ed] the signatures of customers," (*id.* ¶ 119) without providing any specifics as to the dates Babbitt allegedly falsified the applications or forged signatures, how many times Babbitt allegedly falsified the applications or forged signatures, or any other specific details regarding Babbitt's alleged fraudulent acts. Without more, these allegations are insufficient to

11

establish a knowing breach of Babbitt's fiduciary duty under Rule 9(b).

Defendants' allegations that Babbitt stole from a customer likewise fail to plausibly state a claim. While it is true that Defendants provide more detail about the customer who was allegedly overcharged, Defendants' allegations fail to plausibly allege that Babbitt intentionally misled and stole from that customer. Defendants allege that, a month after finalizing a deal with Babbitt, the customer noticed that "his monthly rate was substantially higher than he had discussed with Babbitt," (*id.* ¶ 122), at which point he returned to Koeppel to inquire about his higher rate, (*id.*). Defendants assert that "[Koeppel] then reviewed the customer's file which only reflected a down payment of ten thousand ($10,000) when he had actually paid twelve thousand dollars ($12,000)." (*Id.*) While the implication of these allegations is that Babbitt took some sort of action that led to the customer being charged a higher rate than he had agreed to, the counterclaim is devoid of any specific allegations as to what that action was and when it happened, other than the conclusory assertion that Babbitt engaged in "improper and illegal conduct." (*Id.* ¶ 123.) The only action detailed in the allegation is that Babbitt "finalized a deal" with the customer; then, a month later, Koeppel reviewed the file and noticed an error. Furthermore, nowhere do Defendants connect their earlier allegations that Babbitt falsified records and forged signatures with the allegations surrounding the $2,000 discrepancy in the customer's down payment. Taken together, these allegations are insufficient to state a claim for breach of fiduciary duty under Rule 9(b)'s heightened pleading standard. *See Faulkner v. Verizon Comms, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (explaining that even "where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud."). Accordingly, Count I is dismissed.

### C. Counterclaim III—Faithless Servant Doctrine

Defendants next assert that Babbitt violated the faithless servant doctrine. Under the faithless servant doctrine, "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of [her] services is generally disentitled to recover [her] compensation, whether commissions or salary." *Doe v. Solera Capital LLC*, No. 18-cv-1769 (ER), 2019 WL 1437520, at *9 (S.D.N.Y. Mar. 31, 2019). In New York, courts "continue to apply two alternative standards for determining whether an employee's conduct warrants forfeiture under the faithless servant doctrine." *Carco Grp., Inc. v. Maconachy,* 383 F. App'x 73, 76 (2d Cir. 2010).

The first standard requires that "the misconduct and unfaithfulness . . . substantially violates the contract of service" such that it "permeates the employee's service in its most material and substantial part." *Solera Capital LLC*, 2019 WL 1437520 at *9. While New York courts have not defined the "material and substantial standard," courts have "found disloyalty not be 'substantial' when the behavior consisted of a single act of disloyalty, as opposed to a persistent pattern, or when the employer knew of and tolerated the behavior." *Id.* (collecting cases). The second standard requires only "misconduct . . . that rises to the level of a breach of a duty of loyalty or good faith." *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 202 (2d Cir. 2003). This standard is met when an employee "acts adversely to [her] employer in any part of the transaction, or omits to disclose any interest which would naturally influence [her] conduct in dealing with the subject of [her] employment." *Id.* "New York courts have not reconciled any differences between [the two standards], or defined the circumstances, if any, in which one standard should apply rather than the other." *Id*. *Solera Capital LLC* explains that "the two Second Circuit cases that highlight the conflict, the court simply

13

noted that the defendant in each case was liable because he qualified as a faithless servant under either test." *Solera Capital LLC*, 2019 WL 1437520, at *9 (citing *Carco Grp.*, 383 F. App'x at 76); *see also Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 84 (S.D.N.Y. 2015).

Here, Defendants' faithless servant claim fails for substantially the same reason as its fiduciary duty claim. In fact, Defendants' faithless servant claim is premised on the exact same factual allegations as its fiduciary duty claim. (*See* Answer & Counterclaims ¶¶ 135-142.) With respect to the first faithless servant standard, Defendants fail to provide any further detail beyond conclusory allegations such as "Babbitt's disloyalty permeated her services in its most material and substantial part." (*Id.* ¶ 141.) With respect to the second standard, the same analysis conducted as to Defendants' fiduciary duty claim applies, because the second standard requires a showing of misconduct that "rises to the level of a breach of loyalty or good faith." *Phansalkar*, 344 F.3d at 202. Because Defendants have failed to adequately plead such a claim, Count III is dismissed.

### D. Counterclaim IV—Tortious Interference with Business Relations

Defendants next argue that Babbitt tortuously interfered with its business relations. To state a claim for tortious interference with business relations, "four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Those claims are limited to alleged interference with existing relationships, "as opposed to . . . hypothetical relationships with future [customers]. . . ." *Galland v. Johnston*, No. 14-cv-4411 (RJS), 2015 WL 1290775, at *7 n.6 (S.D.N.Y. Mar.

19, 2015). Furthermore, to survive a motion to dismiss, a plaintiff must "adequately allege specific business relationships with which [the] [d]efendant allegedly interfered." *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 535 (E.D.N.Y. 2017).

Here, Defendants allege that Babbitt "interfered with Koeppel's business relations by fraudulently falsifying credit applications and stealing money from customers." (Answer & Counterclaims ¶ 144.) However, the claim does not identify "specific business relationships with which [Babbitt] allegedly interfered," other than references to unnamed financial lending institutions. *See Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 402 (S.D.N.Y. 2012) (dismissing claim where plaintiff "d[id] not identify any specific third-parties with which it has business relations, but merely refer[red] to 'existing customers,' and 'major companies' with which it has 'strong business relationship[s]'"); *see also id.* at 402-03 (collecting cases). This pleading deficiency is fatal to Defendants' claim of tortious interference with business relations, and Count IV is accordingly dismissed.

### E. Counterclaim V—Unjust Enrichment

Lastly, Defendants allege a claim for unjust enrichment. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). Unjust enrichment "is not available where it simply duplicates, or replaces, a conventional contract or tort claim," but rather applies "when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create and equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).

Defendants' claim fails because it does not adequately plead that Babbitt benefited at Defendants' expense with the required specificity. Defendants' unjust enrichment claim is premised on the allegation that Babbitt stole $2,000 from a customer that Koeppel was later forced to reimburse. (Answer & Counterclaims ¶¶ 146-150.) However, Defendants fail to plead specific facts connecting the $2,000 it had to reimburse to the customer with Babbitt's actions—other than the allegation that Babbitt was the employee with whom the customer initially finalized a deal. Defendants' conclusory assertion that "upon information and belief, Babbitt intentionally stole a portion of a customer's down payment," without more, is insufficient to state a claim for relief. Accordingly, Count V is dismissed.

### IV. CONCLUSION

For the foregoing reasons, Babbitt's (Dkt. 47) motion to dismiss Defendants' counterclaims is GRANTED.

SO ORDERED.

Dated:   Brooklyn, New York
         June 15, 2020

                                                  /s/ Nicholas G. Garaufis
                                                  NICHOLAS G. GARAUFIS
                                                  United States District Judge